This case was a lawyer's dream for the perfect employment age discrimination case. We had a case of testimony of five peers saying that Malkenny was passed over for promotion because of his age and was terminated because of his age. We had an expert witness who reviewed what happened and found that Peter Piper's explanations for the termination and the promotion were pretextual and who on his own concluded that Kenny was terminated because of his age. We had reasons from Peter Piper that changed depending on who they told their story to, whether they were telling Malkenny or whether they were telling their internal people in an e-mail or whether they were telling the Equal Employment Opportunity Commission. We have direct evidence of age-related comments over a long period of time directly related to the termination. And finally, we have an Equal Employment Opportunity Commission reasonable-cause finding. When you put all those together, this case had disputed facts that deserve to be heard by a jury. I want to spend a few minutes talking about the reasonable cause determination. I come to you as a lawyer with 30 years' experience, and what I do is employment law, representing mostly employees. And when an employee comes to me, the decision about whether to take the case is to a large extent governed about whether there was a reasonable cause determination. I hope that this Court uses this case and this opportunity to give guidance to the Equal Employment Opportunity Commission, to practicing lawyers, and to district judges about when and how a cause finding should be used in connection with summary judgment proceedings. Do you agree that the state of the law in the Ninth Circuit now is that that determination will not alone defeat a motion for summary judgment? I agree that that is what Coleman says. I agree that there are cases that have said that. I think we need guidance, though, because Coleman — Well, there's a fairly recent case that's squarely on point that flatly says the fact that a determination is highly probative, however, does not support Ms. Mondero's contention that an EEOC determination letter is somehow a free pass through summary judgment. Sure. It's squarely on point. You have Plummer, which says just the opposite, by the way. You have an earlier case which I believe said in no uncertain terms that it was. Mondero didn't read it that way. And Mondero, I think, was March of this year. What happens, Your Honor, is there is not clear guidance as to when and how a reasonable cause determination should be used. And that's what I hope that this Court does, is give us some guidance as to how probative should it be. I agree — Well, it's — I think, clearly, the law now is that it is to be used by the district court, and the district court is to give it the weight that a factfinder would give it, not conclusive, but — so what else can there be? Well, in this case, the — this district judge felt, in his words, that a cause finding was, quote, barely an inference, barely an inference, Your Honor, and I think it's entitled to more weight than that. And so what I believe this Court should do is say, first, what weight is it to be given? Not just that it's admissible. I think that's a given. I don't even — Peter Piper doesn't argue otherwise in a line of cases say so. But what degree of weight does it get? And more important, if a district judge says not to give it credibility, that the judge should say why. This judge cited Coleman, did not give any explanation as to why this EEO determination was flawed or why he would grant summary judgment in the face of it. And I don't believe any of the cases give us, as practicing lawyers, guidance. And an EEOC determination — In your brief, you took the position that the determination letter was conclusive, that that was, as we said in Mondaro, a free pass through summary judgment. Do you agree now that is not the law? I believe this Court should give us guidance. I believe — Do you believe that is not now the law, in spite of what you said in your brief? I believe we have conflicting decisions within this Court. Plummer says that. It's very clear, though, that when you have conflicting decisions from the same Court, you take the last one. I agree with Your Honor about that. Okay. Mondaro is the last one. Is that true? To my knowledge, yes, Your Honor. So are you then willing to concede that the position in your brief is incorrect for purposes of discussion? Yes, Your Honor. Okay. I do concede that a — in your words, an EEOC determination should not be a free pass. What I hope that you do is give us all guidance. And by the way, Your Honor, I wanted to focus on that for a few minutes because I think that is an important issue here, but that's not the determinative issue, Your Honor. What happens is that you have to look for fact questions, and you don't have to look far in this case. We listed, I think, 23 fact questions in the last three pages, five pages of our opening brief, and try as I might, I read their answering brief, and what they did was argue with our facts. They did what this Court has said a number of times is improper, and that is to take their spin on the facts and ask the Court to look at them a different way. They did what the district court did not do, or did, which is to take all inferences in their favor and argue that those issues should be enough to create — aren't enough to create a fact issue. So you have two claims, a promotion claim and a termination claim. And I gather your best claim in your briefs is the termination claim, at least that's the way it's presented. So what are the material facts, briefly, that you focus on that show that there's a genuine dispute that needs to be tried? Sure. Here — I'll give you a number. Here's some simple ones. Mountkenny was terminated in early October of 2000. In June, three months earlier, he was put in charge of all of the other place — all of the other — in charge of all area managers. If he was such a bad performer, why three months earlier did they make him the boss? Who's the they? Who put him in charge? His immediate supervisor, Mr. Toole, who went on vacation. He was the — what's called area manager. In order of how these things work, you have a store with a general manager, you have an aerial supervisor, area supervisor, Mountkenny and others, over five to eight stores. And over that was a regional manager, and over that was the operations officer. The area manager, Mountkenny's immediate boss, put him in charge of all of the area managers when he went on leave. That's a fact question. Why put him in charge if — just a handful of months earlier, if he was so bad? Did the person who put him in charge have anything to do with terminating him? He was one of the two people who were there. He was Mountkenny's immediate supervisor. When he was terminated, two people were there. And this becomes important in the facts. Mr. Toole was there, and Mr. Barton was there. So Mr. Toole agreed he should be terminated? He was there for the termination, and — So isn't that kind of odd? I mean, if he had something against him — if he didn't have anything against him before, how come all of a sudden he has something against him a couple of months later when he's still basically the same age? This is like — this doesn't seem to follow. Well, that whole answer — If I hire you and you're black and then I fire you three months later, it could hardly be because you're black or I wouldn't have hired you in the first place. So if Toole was letting him go, I mean, why isn't it a rational inference from that that it had something to do with performance, not age? Well, Toole didn't speak at the termination meeting. The man who did was Toole's boss. Did Toole protest? We don't know. Nothing was said by him in the record. Well, the other thing you said, Barton's the other guy? Yes, sir. There's an interesting comment. Greg then said, I couldn't be an area supervisor at this point in my life. Mal, you're just in the wrong world. And then your client says, I thought Greg was saying I was too old. I don't read it that way. I couldn't be an area supervisor. You're just in the wrong world. That's like saying I couldn't be a fullback in the NFL. You get killed. And that's the way people talk. It isn't you meaning you. It means sort of universal you. And it seems to me what he's saying here is I couldn't be. You're just in the wrong world. He's referring to himself. Your Honor, that comment was heard by Mal Kenney to be an age-related comment. That comment in the context of the conversation can reasonably be seen to be an age-related comment. And that's the kind of thing a jury should hear. There were a whole slew of comments like that. Mal Kenney being told, you're too old to run races. Mal Kenney being held up at a company meeting as a, quote, cover boy for the American Association. You may satisfy your prima facie case, but then you get into the area of pretext. And then the burden shifts back. The question is whether you demonstrated enough to destroy the pretext for purpose of summary judgment. Well, I think the standard is the same. If we had enough information to go in the first place, that overcomes pretext as well. And if the prima facie case overcomes pretext? There's a lower, let me rephrase that. There's a lower standard to create a prima facie case once you do the burden shifts. But the evidence that you came forward with to create the prima facie case here was so strong that that overcomes pretext in the first place, is how I would look at that in a big picture. There were other issues. What's the key evidence that you want us to look at to see whether you effectively destroyed the claim of pretext? Mal Kenney, the shifting reasons would be a big fact reason. Mal Kenney was told, you're fired for your operation of Store 83. That was what he was told, and that was significantly emphasized in the e-mail, pre-termination e-mail. By the time it gets in front of the EEOC, they apparently abandoned that issue. And more so when Barton, who writes the e-mail, it says, I'm firing him tomorrow, and I'm doing so because of operations in Store 83, which he then tells Mal Kenney is the only reason he's being fired. Barton then admits under oath that he was mistaken. You can read it any way you want, but you read that deposition testimony that's in the record. The operations of Store 83 were not flawed, not a problem, not any different than others. The district court says the plaintiff asserts, for example, that Mr. Barton admits that he was, quote, mistaken about the plaintiff's turnover rate. An examination of the testimony, however, reveals that Mr. Barton attempted to explain that he based his comments on a number of terms rather than on a year-end rate. If you look at what he gave the basis for when he did his termination paperwork e-mail, he cited a specific period 9. We grabbed those. I got those figures and cross-examined him about it, and he backed off completely. Shifting reasons for termination creates a fact issue. If you need to go, you don't need to go any further than reading the district court. The district court says, upon analysis, it's not clear that the proper justifications are not fundamentally different, as the plaintiff suggests. You know, there's some differences, but the district court concluded it's basically the same. There's some different articulations, but if you look at all the reasons and you add them up under every circumstance, it's pretty much the same thing. Well, of course, this Court's job is to de novo review, and I ask that you read the deposition testimony. I can give you the pages and the document and the answers. Yeah, I've looked at it. You will see for yourself that his core evidence, the district court did what I don't think he should do, which is to give not give us inferences, but instead to spin the testimony in the light most favorable to Peter Piper. I don't think that appropriate. And that is another piece of evidence. Turnover rate. Turnover rate. How do you do it? I think a good report to read would be the expert witnesses report. Dr. Reich, he's a full professor at one of the three universities in Arizona, Northern Arizona University. This full professor looked and proves pretext as well. That's a ‑‑ if you look at expert excerpt page 91, you will see that. He offered an opinion. He ultimately offered an opinion, but he gave the basis for it. I understand that he was discriminated against, which was the ultimate opinion of Dr. Reich. You may choose not to allow. That may be outside the scope of what an expert should do. But if you look at the underlying facts and how he got there, mistaken calculations about turnover rate, quality performance at Store 83, the facts that he based his opinion on are in the record, they're there, they're highly probative, and they were ignored by the district court. Where is it ‑‑ where do we deal in a case with the weight to which an expert's opinion must be given when it's pretty much going to the ultimate fact? Well, as I was saying, he does get to the ultimate fact. Is there any case that says that that has any weight at all? Ordinarily, an expert's conclusion on ultimate facts aren't given much weight because it invades the province of ‑‑ No. And I agree with you, Your Honor, that the ultimate fact, but I was asking that you read his report to see how he got there, because when you read the underlying conclusions that are clear in his report, those create a fact question as well. The longer you're in this business, the longer you mistrust experts because it seems that all sides can come up with experts. Well, that's fair. That's fair, Your Honor. But the point is that if you look at all the evidence, direct testimony ‑‑ That's the key thing is the evidence. Yeah. If you look at the direct evidence, five peers say so. You look at direct evidence, what Kenny was told, shifting reasons, there are fact questions here, and that's really why we're appealing, and that's why this case needs a trial, Your Honors. I'd like to reserve the five minutes. Thank you. Good morning, Your Honors. May it please the Court, Lawrence Rosenfeld representing Appellee Peter Piper. Your Honors, I'd like to begin by observing that what we've heard here this morning by Mr. Martin is very reminiscent of what we heard in the trial court. Neither in the trial court nor here in framing his argument, since the appellate admonition of this Court and other circuits as well, by the way, that the discrimination laws are not intended to provide a vehicle for judicial review or second guessing of management decision‑making prerogatives, decisions that are traditionally left to the exercise of management discretion. This Court, for example, in Douglas v. Anderson said, quote, the reason for a business decision need not meet the unqualified approval of the judge or jury. Yeah, there's no question about that. As long as it is not based on age. We're not going to quibble with whether it was a good advantage or not. We're simply at this point, I think, in trying to determine whether that was a coverup for the real reason. The other side says the real reason is they decided he was too old. Right, and I think this Court has properly focused its questions to appellant on that very issue. And I would submit that based on what was presented below and what was presented here, no fact issue, no material issue of fact, no genuine issue of material fact has been raised by the appellant to overcome the legitimate non‑discriminatory What are the non‑disputed factual issues that you can look at and say, looking at those non‑disputed facts, there's no dispute as to these key facts. Certainly. The legal conclusion is that there's no violation of the right not to discriminate against any facts, certainly because of his age. Certainly. Let me start with the direct evidence, which I think has already been addressed by the Court, and that is one statement that the appellant claims was made, and that is the comment you're in the wrong world. This Court has stated very specifically in the ‑‑ in a number of cases, and let me, if I may, quickly cite to one of those cases. This Court has stated that in the Dominguez case, for example, that what evidence has to be adduced in order to constitute direct evidence would be comments that are, quote, clearly sexist, racist, or similarly discriminatory. The one statement they rely on here, that now you're in the wrong world, I couldn't do this in my life, is not directly a discriminatory statement. It is not a direct evidence of discrimination. It is nothing like the ‑‑ Greg's a pretty important person, isn't he? Mr. Barton? Yes. I mean, he seems to be the person behind the decision. He made the decision. And he's the one who believes that ‑‑ how old is he? He, at the time, I believe, was 38 or 39, Your Honor. And why isn't this susceptible of a view that he's saying, hey, I couldn't be an area supervisor at this point in my life. Is that saying, hey, that's just for younger people? I don't think so. You're in the wrong world. And the inference taken at the moment was that the statement was that I was too old. Why isn't that a fair inference for a jury to ‑‑ Well, really, two responses to that. I think, Your Honor, it requires a stretch, number one, as I think you were suggesting in questioning Appellant's counsel. But number two, as I say, the Dominguez case, the Twain case, the Schnidreich case, all of those cases state that direct evidence cannot be evidence that requires inference or interpretation. It must be clearly biased in its content. So you're pigeonholing everything as indirect. I am, Your Honor. That's correct. I would suggest that this case is much more closely aligned in terms of the direct evidence analysis with cases like Merrick, Nids, and Nesbitt, all of which we discuss in our brief, all of which, by the way, found the statements, which were somewhat arguably less ambiguous as to age, to be too ambiguous, too ambivalent to constitute direct evidence of discrimination, in all of which cases this Court upheld the trial court's grant of summary judgment. With respect to the circumstantial evidence, I guess I would start with the issue of the performance matters, and I want to talk about a couple of the things that were mentioned by Appellant's counsel. Turnover, for one thing. Mr. Barton, at his deposition, talked about turnover rates. That is, in fact, the case. When it came to – when he was shown the turnover rates, he said, well, I guess what I really meant was the number of turnovers. He had 20 turnovers in a very short period of time. When Mr. – the Appellant, Mr. Kenney, was deposed and was presented with those numbers, he said – and we cited to this in the brief – he said, my turnover numbers were inordinately high. So the fact that Mr. Barton talked about a rate when he meant a number does nothing to raise a fact issue as to whether or not the turnover rate was inordinately high because the Appellant himself testified that his turnover rate was inordinately high. He also testified that he took issue with the manner in which turnover was measured. And, in fact, you heard Appellant's counsel mention that the expert opined on the manner in which turnover was measured. But the case law is very clear, and I would cite the Court most particularly to the Coleman case. The fact that someone takes issue with a measuring device, with the way a company assesses performance, with the way it assesses turnover, whatever the case might be, is not enough to rebut the legitimate nondiscriminatory showing to raise an issue of pretext unless it can be shown that that measuring device was applied discriminantly or indiscriminately, I guess I would say, in a discriminatory manner toward the party, in this instance, on the basis of age. There is no showing here that the way the company measured turnover was skewed for purposes of this Appellant. It measured it the way it measured it, and the numbers were the numbers. There's no evidence that there was a dis — that there was an attempt to skew those numbers in the case of the Appellant. On a broader question, plaintiff says that Martin told them that the performance of Store No. 83 was the main reason for his termination, but the company's position paper to the EEOC lists a whole bunch of different things that seem to be unrelated to that. How would you get around that discrepancy? I don't think there's a discrepancy at all, Your Honor. There's no case, and they've cited none and I've found none, that says that the reasons you give someone at the time of their termination has to include everything that went into the determination. The fact of the matter is that on September 18, 2000, the plaintiff was given a letter, a memo, from Mr. Barton that said, here are your performance issues. You need to get back on track regarding profitability, regarding relationships with your staff, regarding a whole host of things. Those reasons were all supplied to the plaintiff. The fact that at his termination, that laundry list of problematic performance issues were not again reiterated really does not create an issue with respect to whether the reasons change. If you compare what he was told on the 18th or the 8th of September, memorialized in the memorandum on the 18th of September, with what was in the position statement, they are a precise match. The reasons did not change. The reason that the only way the appellant can make this argument that the reasons change is by ignoring the September 18th memorandum. What the appellant chooses to do, for some reason that I still have, am unable to discern, is they say, why don't you compare the October 5th email that Mr. Barton sent to the Human Resources Department, where he says, in addition to the things I've previously discussed with Mr. Kenney, here are some things that have happened since our September 8th meeting. And they say, if you look at what's in the October 5th email and compare that to the position statement, they're not the same. Well, the two responses are, why would you limit the comparison between the position statement and the October 5th email? The October 5th email did not eviscerate or supersede the reasons identified in the September 18th memo. And number two, frankly, the items mentioned in the October 5th email are also mentioned in the position statement. The fact that all of those reasons, Your Honor, were not mentioned at the termination meeting does not create an inference of pretext. There is no obligation that when you're terminating an employee that you sit there and you go through a laundry list of reasons. It's clear these reasons of September 18th were communicated to the plaintiff, and they are all in the position statement. There is no variance in the reasons. The trial court correctly concluded they were substantially the same. I would suggest the trial court was being kind to the plaintiff. I think they were identical. The other argument, I think, that I wanted to spend a moment on is the plaintiff says, well, Mr. Toole said to Mr. Kenney, the plaintiff, in June, can you cover the stores while I'm away for 10 days? And he says that must show he's a good performer. In addition to the comments made by Judge Trott on that score, I do want to point out that if you look at Mr. Toole's September 7th email or memorandum to Mr. Barton, which led to the September 8th meeting between Mr. Barton and the plaintiff where the plaintiff was told you've got these serious issues, you will note that virtually everything that's in that memorandum related to things that happened after June of 2000. There were a significant number of people who left the company who were under Mr. Kenney's supervision. There was a violation of a company policy on August 10th. There was a violation of a company policy on August 26th. There was a robbery that was unreported on August 26th. There was an unsatisfactory event regarding the health of a customer resulting in food poisoning on August 21st. There was an incident with a dispute with a hiring person, Ms. Taylor, on August 21st. There was an issue on September 5th that came up regarding the profitability of the school lunch program. There was a visit on August 17th to his restaurant 83 that was unsatisfactory. And there was a visit to his restaurant number 83 on September 6th that was unsatisfactory. Every single item in that memorandum from Mr. Toole to Mr. Barton occurred after June of 2000. So the notion that the Court should infer or conclude that there's a fact issue based on the fact that in June Mr. Toole requested that the plaintiff cover the stores for 10 days while Mr. Toole went on vacation really does not raise any inference or pretext at all. With respect to the performance of Store 83 that was raised by the appellant, remember the initial issues regarding Store 83 were operational issues. There were at least two visits to that store that were unsatisfactory in terms of the service that was being provided, in terms of the dress of the staff, a whole host of things that are memorialized in Mr. Toole's September 7th memorandum. The plaintiff at his deposition admitted that he never responded to Mr. Toole's requests regarding cleaning up the app at that store. That's in the record. That's cited in our brief. With respect to financial performance, sure, we can – Was the state of the operations at Store 83 mentioned in the reply to the EEOC? Store 83 in particular? Yes. Yes. In fact, what was done in the position statement was attached to the position statement was Mr. Toole's September 7th memorandum. The September 7th memorandum specifically references the two incidents, the August incident and the September incident at Store 83, reflecting poor operations there. So, yes, both of those were mentioned specifically in detail in the EEOC position statement. With respect to the finances of Store 83 that we've heard considerable chatting about here and in the brief, I would simply point out to the Court that, number one, Mr. Barton attempted at his deposition to explain that he was being asked to opine as to the financial performance of Store 83 based on two pages. Now, those two pages did relate to Store 83. But, for example, Mr. Barton said, well, I really need more information. I don't know, for example, if the school lunch statistics are in here or not. So based on these two pages, it looks okay, it looks fine. But I don't have all of the information I need. Beyond that, in the trial court, we provided the full data, the data that Mr. Barton wasn't shown at his deposition, that showed two things. It showed, number one, that in Period 9, Store 83's performance was unsatisfactory, and year-to-date Store 83's performance was unsatisfactory, and more particularly that across all of Mr. Kenney's stores for Period 9 and for year-to-date, he was one of the two most or two least successful performers. And, by the way, the other performer whose performance was, in fact, comparable to his, Ms. Klein, she was 38 years old. Her performance was equally poor. She was terminated three weeks before he was, a 38-year-old female. It's interesting, and I'll just note this briefly. Mr. Kenney, in talking about Ms. Klein's performance in one of the documents he submitted to the EEOC, and I'm not really sure why he felt the need to do this, but he told the EEOC that Ms. Klein was terminated because her financial performance was terrible. Rather ironic, given that that's what Mr. Kenney claims that Mr. Barton said to him, or at least put in a memo. In fact, their financial performances were equivalent. And that being the case, it's hard to see how Mr. Kenney could now take the position that his financial performance wasn't terrible when he characterized someone whose performance was equally poor as having a terrible financial performance. I'd also, I guess, like to take a minute or two, if the Court finds it necessary, to talk about the EEOC cause finding. I certainly agree that Mondaro is definitive on this point. Mondaro clearly says that a cause finding is not a free pass beyond summary judgment. I think, as best I can make it out, I think where the plaintiff goes wrong, if I may suggest this, is that he is equating the notion that a cause finding is highly probative with the notion that that means it has some exalted status because it's in a position statement. And I would suggest there is no case that even remotely suggests that to be the case. Any fact, if we're looking for a standard, if that's what the plaintiff is searching for here, I would suggest that there is nothing about a fact enunciated in a position statement that gives it a status that is, that makes it impervious to the same sort of inquiry on summary judgment as any other fact. So just to use one example of that, let's assume, let's not assume this is what happened. The EEOC investigators affidavit submitted in their response to the summary judgment motion says, well, the company said that Mr. Kenney was a poor performer, but he's produced evidence to me at the EEOC that right before he was terminated, he was nominated as employee of the quarter. Well, we didn't know he told the EEOC that, number one, so we had no opportunity to respond. But putting that aside, one could understand why the investigator would have said, well, boy, that seems inconsistent with the enunciated nondiscriminatory reason, and that's a basis on which I think I'm going to issue a cause determination. Of course, what she didn't know, apparently, because apparently the plaintiff didn't tell her, is he nominated himself. Now, if the fact that the cause finding or the underlying basis for the EEOC's determination is based on that fact, and we can prove that Mr. Kenney, and he admitted this at his deposition, nominated himself, why does the fact that it is in a cause determination make that a fact that is less susceptible to disproving than if it were, for example, in his affidavit, in his deposition, or in his interrogatory answers? And the answer is, it doesn't. And the notion that the Court did not specifically deal with each and everything in the cause finding, item by item, is really does miss the point, because what the Number one, the trial court, despite its comment about barely an inference, did enunciate the highly probative standard. I'd also suggest that the Mondero Court says that the ruminations of a trial judge during oral argument really are of no moment when this Court is reviewing this de novo. So I'm not sure what relevance that has anyway. But beyond that, the fact of the matter is what the trial court did was it painstakingly went through the evidence. It talked specifically about why none of the evidence presented by the plaintiff raised a triable issue. You don't think the district court was weighing the facts? Only in the Rule 56 sense, Your Honor. I don't believe that the judge was weighing the facts. Explain that to me. What does it mean in the 56 sense to weigh the evidence? Determining whether it was a genuine issue of material fact, whether it appeared in the determination letter by the EEOC or elsewhere. What the Court did was, for issue of the financial performance, the Court simply looked at the evidence presented and determined whether or not it raised a genuine issue of material fact. I wouldn't consider that a weighing of the evidence in the trial sense. But it certainly, not to get hung up on semantics, Your Honor, it certainly is a weighing in terms of determining has the appellant come forward with a genuine issue of material fact with respect to pretext. I think that's all the Court was doing. I think that's quite clear from the Court's opinion. And the fact that the Court did not specifically say, let me go item by item through the cause finding, I think is of no consequence. Because the Court, in its overall appraisal of the evidence, in one way or another, did, in fact, hit all of the points that were raised in the cause finding and ultimately found that the company had articulated a legitimate nondiscriminatory reason and that pretext had not been used. Do you think the cause finding plays any role in summary judgment? I think the cause finding plays a role only in that it's another piece of evidence to be evaluated. And if there are facts stated in the cause finding, the trial court needs to look at the facts set forth in the cause finding and, like any other fact, in a cause finding, not in the cause finding, determine whether there's a trial, a genuine issue of material fact that permits the case to get past summary judgment. And I do think ultimately what this comes down to, as I indicated when I began, is that the appellant is asking this Court to essentially determine that the things that he did that are shown on this record, causing women under his supervision to cry, telling them to take a toothbrush to clean the floors, violating rules and then asking that they be excused or explaining why he thinks they shouldn't apply to him, quibbling with the turnover statistics, quibbling with the financial impact of the trial court's summary judgment. Thank you. It felt like we're in the middle of a jury argument. It felt like I stand up and say here's some facts, he disputes with them. And it would be a great win. We're doing a closing argument. I look forward to that. For example, he says Mal nominated himself. He forgets to tell you Mal did so on the urging of two other people who were too busy to do the paperwork. Yeah, he did the paperwork. But it wasn't just his nomination. He gets up and tells you that ---- Who signed the nomination? Pardon? Two other people signed the nomination and he just did the paperwork? Somebody else said, Mal, you should be area supervisor. So he prepared the paperwork for them to sign? And he did the paperwork for himself to nominate himself. Somebody had to do the paperwork. Yes. Who signed it? He signed it. But he did so, according to his testimony, on the urging of others who asked him to do the paperwork. Turnover rate. He makes a big point out of that and talked to you about turnover rate. If you read the testimony of page 530 of the decisionmaker, were you mistaken when you told Ms. Lorenzen that Mal had the highest turnover rate in the company for two years in a row? That was in the e-mail in light of Exhibit 42, which is the 1999 turnover rate. Answer, I may have been discussing numbers of terms. Isn't it true that Mal's turnover in 1999 was the second lowest of any area supervisor within the company and substantially below the company's average? Answer, yes. In 1999, it was the second lowest. All right. Do you know why you would have told her that it was the highest when it was the second lowest? Answer, I could have been looking at the number of terms, as I explained earlier. Counsel talks to you about financial operations. He talks to you about operations of Store 83. Fact question, why, if Store 83's operations were so bad, did they use Store 83 as the store to experiment with new foods, new kinds of dough making? Why, if the operation of Store 83 was so bad, did they use Store 83 to train new managers and new employees? Why, if the operation of Store 83 was so bad, did they use it to bring people from the outside to show how Peter Piper operated, which is why those visits occurred that he complains of? He tells you about another employee who was terminated, Miss Klein. I hope you look in the record and compare the documentation about her termination, where they followed their own procedures, documented, said why, and Mal's termination, where there was no documentation. Why was there no evaluations of Mal Kenny for three years? Why, when he was hired, was there no posting of his job? In the end, I can go on, but these are things that will be argued in front of a jury and not here. I would rather remind and read from just some of your own decisions. I appreciated, Judge Trott, your decision in the Schindrig case where you said, quote, we require very little evidence to survive summary judgment in the discrimination case because the ultimate question is one that can only be resolved through a searching inquiry, one that is most appropriately conducted by the fact finder upon a full record. I appreciated, Judge Paius, your Gordon Dominguez-Curry case, gender case, recently. It is not the province of the court to spin such evidence in an employer's favor when evaluating its motion for summary judgment. To the contrary, all inferences must be drawn in favor of the nonmoving party. The reasoning and decisions of those cases and the others we cited show why summary judgment should not be granted in this case. What would you have us do with the October 5th e-mail? I'm sorry. The October 5th e-mail. How does that fit into your position? It's a shifting reason. You read it and you read it against what was before. The other side says it's a shifting reason only because the items, some of the items referred to in there, in addition to Story 83, weren't discovered until after the $500 for his son's team and some of these other things. Did those have recently come to light? Your answer to that is? My answer is read what was in the position statement. The direct question is why was Malkenny terminated? It didn't say what are the new reasons since an October 5th e-mail are the reasons why Malkenny was terminated. The position statement directly asks and Peter Piper purports to answer why was Kenney terminated. And they're all different reasons than given at first. It's not said these are new reasons in addition to. They didn't. And read the Payne case directly addresses shifting reasons as in and of themselves creating a fact question. Your Honor, we look forward to the trial. Thank you. All right. Thank you, counsel. The matter will be submitted.
judges: Trott, T.G. Nelson, Paez